COLBOCH, Appellant and Cross–Appellee,

v.

UNIROYAL TIRE COMPANY, INC., Appellee and Cross–Appellant.

[Cite as *Colboch v. Uniroyal Tire Co., Inc.* (1996), 108 Ohio App.3d 448.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 68017.

Decided Jan. 2, 1996.

*Spangenberg, Shibley, Traci Lancione & Liber, John D. Liber, Justin F. Madden* and *James A. Marx,* for appellant and cross-appellee.

*Roetzel & Andress, Jeffrey J. Casto, Amie L. Bruggeman* and *Randall J. Moore,* for appellee and cross-appellant.

---

KARPINSKI, Judge.

Plaintiff-appellant and cross-appellee, Jack Colboch, appeals from a jury verdict in favor of defendant-appellee and cross-appellant, Uniroyal Tire Company, Inc. Plaintiff raises two assignments of error questioning (1) the instructions given to the jury, and (2) the granting of a directed verdict for the defense on the issue of a manufacturing defect. On appeal, defendant raises three cross-assignments of error asserting that (1) the trial court erred in not allowing defense of assumption of the risk, (2) plaintiff's expert should not have been permitted to testify, and (3) the trial court erred in excluding evidence of plaintiff's claim against the Patch Rubber Company. For the reasons explained below, we find merit to plaintiff's objections and reverse the judgment of the lower court and remand for further proceedings. The relevant facts follow.

On September 30, 1988, plaintiff was injured while mounting a tire at work. More specifically, plaintiff was employed as a mechanic at the Howard Westlake Garage in Cleveland, Ohio. Plaintiff, who had over thirty years' experience mounting tires as a mechanic, testified that he was asked to help a younger mechanic, Paul Kraig, mount a tire on a Chevrolet pickup truck. The tire was a new fifteen-inch Uniroyal Tiger Paw tire. As plaintiff was mounting it, the tire exploded, causing severe injuries to plaintiff's thumb, wrist, and shoulder.

At trial, the parties presented a detailed description of the method plaintiff employed in attempting to mount this tire. Plaintiff first tried to use a tire mounting machine known as the Coats 20/20 machine. After unsuccessful attempts, plaintiff removed the tire from the Coats machine and attempted to mount the tire on the floor, using an O-ring bead seater. An O-ring bead seater is a device manufactured by Michelin for use in mounting tires. Even with this device, plaintiff could still not properly seal the tire onto the rim because the tire continued to leak air. As the plaintiff continued to apply air pressure, the tire exploded.

The parties disagree as to the amount of air pressure in the tire at the time of the explosion. Plaintiff and Paul Kraig, who observed the events, stated that the tire was not inflated over thirty-five p.s.i. Additionally, plaintiff's expert, Dr. Alan Milner, concluded that the tire was not overinflated at the time of the explosion. On the other hand, the defendant's expert, Donald Ovila, opined that the pressure was over one hundred p.s.i.

Plaintiff's witness, Paul Kraig, was unavailable at trial. By way of a deposition read in open court, he provided the following testimony. He worked for three

years as a mechanic at the Westlake Garage where he had changed over one hundred tires. On September 30, 1988, he was mounting four new tires on a truck when he encountered problems mounting the fourth tire and asked the plaintiff to help. Air was leaking out of the tire as fast as it was being put in the tire. He stated that there was no rust on the wheel and that everything was lubricated according to the usual procedure for mounting tires. After unsuccessfully using the Coats machine to mount the tire, Kraig and the defendant turned to an O-ring. An O-ring is a device commonly used to help create a seal when mounting a tire. The O-ring was used on the whitewall side of the tire, which side was on the ground. Plaintiff had used the O-ring on approximately half of the tires that he mounted and never experienced any problems with its use.

At the time of the explosion, Kraig stated that plaintiff applied pressure for fewer than ten seconds. He also stated that the air compressor was at one hundred twenty p.s.i. Kraig noticed air was leaking from the tire as plaintiff was applying the air pressure. Kraig stated that he was not concerned that plaintiff would overinflate the tire because the pressure was applied to the tire over such a short period of time; it was not possible to overinflate the tire so quickly.

Dr. Alan Milner, plaintiff's expert, described a tire bead as follows:

" * * * a part of the tire that's in contact with the rim, the part that defines the opening in the tire, if you will, the middle of the donut, if you visualize it like that, and inside that is a steel wire structure that's made of material that's very similar to the wires in a piano, high strength steel wires, and it's the fracture of those wires under very specific circumstances that are at the root cause of the explosion of tires and tire mounted situations such as we're concerned with here."

Milner is a metallurgical engineer specializing in failure analysis concerning tire beads, tires, and tire mounting machines. Milner described in detail the process by which a tire is mounted.

Milner stated that the cause of the tire exploding was a failure of the structural part of the tire bead. He stated that it rarely takes less than forty p.s.i. to seat this type of tire but once a tire is seated, it can withstand pressure of over one hundred seventy five p.s.i. Milner disagreed with the defendant's expert, who claimed that the tire would not explode during mounting, even in a hang-up situation, at less than eighty or one hundred p.s.i. Milner stated that the explosion "was certainly caused by the bottom bead failure" and that the pressure was under forty p.s.i. at the time of the explosion. Milner's opinion was based on undisputed testimony that the top bead had not seated and that the tire was not projected high off the ground at the time of the explosion. Finally, Milner concluded that the multistrand weftless design, used in the tire in question, was "unreasonably dangerous and defective because of its propensity to fail too frequently in the mounting process." On redirect Milner stated that if the tire

had been designed with a multistrand fifty-mil wire (as opposed to the thirty-seven-mil single strand design used for the tire in question), it would not have exploded under the circumstances of this case.

Dr. William Seitz was the final witness presented by the plaintiff. His videotaped testimony described the injuries plaintiff suffered.

The defendant presented two witnesses, Donald Ovila and Richard Westlake. Ovila, who worked as an engineer in the tire industry since 1958, testified extensively concerning the structure of tires. Testifying about how tires are mounted, he explained that a clip-on chuck and extension air hose are devices used to allow the person inflating the tire to step back away from the tire during inflation. He also noted that tires can be mounted on the ground but that it is not a very good practice because there is nothing to hold down the wheel. Ovila admitted that a hang-up can occur when the tire bead will not seat no matter how much air pressure is applied. Concerning the various designs, Ovila admitted that the single strand bead design is capable of being broken. If a hang-up occurs, the proper procedure is to let the air out and start over. He advised that if the pressure does not exceed forty p.s.i. there will never be a problem. He also stated that none of the bead designs mentioned would prevent a tire from failing during a hang-up situation at pressures above one hundred p.s.i. Furthermore, at that pressure it would not have made any difference if the tire in question had a single strand bead instead of a multistrand bead. He concluded by stating that the multistrand bead used by Uniroyal was not defective.

Based on his education, his experience, and his examination of the tire, he concluded that the pressure was well in excess of one hundred p.s.i. at the time of the explosion. There is no correlation, he said, between tire pressure and the height the tire reaches upon explosion because an explosion of this type could lift the tire seventy-five feet in the air or less than an inch.

Also testifying for the defendant was Richard Westlake, the owner of the garage. He stated that the normal practice is to have the tires mounted on the Coats machine. He also admitted that one does not need a Coats machine to mount a tire and that tires can be mounted by hand. Additionally, he stated that whether a tire is going to blow up has nothing to do with whether the tire is on the floor or on the Coats machine. On cross-examination, he admitted that the garage did not have any clip-on chucks at the time of the accident.

The depositions of Stanley Lew and Richard Harrison as rebuttal witnesses were read in open court. Stanley Lew is currently employed by Michelin Tire Corporation and was previously employed as a tire engineer by Uniroyal and B.F. Goodrich. He stated that the single strand bead design was more fracture-resistant than a multistrand weftless bead design.

At the close of the defendant's case, the trial court granted defendant's motion for a directed verdict on the issue of a manufacturing defect. Additionally, the trial court declined to instruct the jury regarding the consumer expectation theory of products liability.

The jury returned a verdict for the defendant. The plaintiff timely appealed, raising two assignments of error.

Plaintiff's first assignment of error states as follows:

"I. The trial court erred by failing to properly instruct the jury on the applicable law regarding products liability."

Ohio has codified much of the case law on products liability. R.C. 2307.75, on design defects, states:

"(A) Subject to divisions (D), (E), and (F) of this section, a product is defective in design or formulation if either of the following applies:

"(1) When it left the control of its manufacturer, the foreseeable risks associated with its design or formulation as determined pursuant to division (B) of this section exceeded the benefits associated with that design or formulation as determined pursuant to division (C) of this section;

"(2) It is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner."

The Ohio Jury Instructions have adopted the two theories of design defects covered in this statute. 3 Ohio Jury Instructions (1994) 201–202, Section 351.09. In the case *sub judice,* however, the trial court instructed the jury only on the risk benefit theory described in (A)(1), not on the consumer expectation theory found in (A)(2).

Both the consumer expectation test and the risk benefit test have been recognized by Ohio law. In *Leichtamer v. Am. Motors Corp.* (1981), 67 Ohio St.2d 456, 466, 21 O.O.3d 285, 291–292, 424 N.E.2d 568, 576–577 the court adopted a form of the common consumer expectation test as follows:

"The concept of 'unreasonable danger,' as found in Section 402A, provides implicitly that a product may be found defective in design if it is more dangerous in use than the ordinary consumer would expect. Another way of phrasing this proposition is that 'a product may be found defective in design if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.' *Barker v. Lull Engineering Co., Inc.* (1978), 20 Cal.3d 413, 429, 143 Cal.Rptr. 225 [235–236, 573 P.2d 443, 453–454]. As the California Supreme Court pointed out, such a standard is somewhat analogous to the commercial law warranty of fitness an merchantability. *Id.* As stated, *supra,* this court has

previously recognized a definition of product defect also based upon an analogy to commercial warranty. *Lonzrick v. Republic Steel Corp.* (1966), 6 Ohio St.2d 227, at page 235 [35 O.O.2d 404, at page 408–409, 218 N.E.2d 185, at page 191]; *Temple v. Wean United, supra,* [ (1977), 50 Ohio St.2d 317] at page 321 [4 O.O.3d 466 at page 468, 364 N.E.2d 267 at page 270–271]. This standard reflects the commercial reality that '[i]mplicit in * * * [a product's] presence on the market * * * [is] a representation that it [will] safely do the jobs for which it was built.' *Greenman v. Yuba Power Products, supra* [ (1963), 59 Cal.2d 57], at page 64 [27 Cal.Rptr. 697, at pages 701–702, 377 P.2d 897, at pages 901–902].

"Moreover, a consumer-expectation test of unreasonable danger recognizes the legitimacy of one of the fundamental values in the law of torts: 'the protection of the individuality of persons, by according formal respect for their fairly developed expectations of product safety * * *.' Owen, Rethinking the Policies of Strict Products Liability, 33 Vanderbilt L.Rev. 681, at page 690.

"Thus, we hold a cause of action for damages for injuries 'enhanced' by a design defect will lie in strict liability in tort. In order to recover, the plaintiff must prove by a preponderance of the evidence that the 'enhancement' of the injuries was proximately caused by a defective product unreasonably dangerous to the plaintiff.

"A product will be found unreasonably dangerous if it is dangerous to an extent beyond the expectations of an ordinary consumer when used in an intended or reasonably foreseeable manner." (Footnotes omitted.)

In *Knitz v. Minster Machine Co.* (1982), 69 Ohio St.2d 460, 23 O.O.3d 403, 432 N.E.2d 814, the Ohio Supreme Court reiterated its support for the consumer expectation test and noted that there are fact situations where the test is inapplicable. The court then added the risk benefit test as an alternate theory to prove design defects. These two tests were codified by the Ohio legislature in 1987. R.C. 2307.75(A).

It is well established that a trial court may instruct the jury using the risk benefit theory, consumer expectation theory, or both. *Jordan v. Paccar* (C.A.6, 1994), 37 F.3d 1181; *Smith v. Michelin Tire Corp.* (Mar. 18, 1993), Cuyahoga App. No. 61952, unreported, 1993 WL 76882. "In reviewing a record to ascertain the presence of sufficient evidence to support the giving of a[n] * * * instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction." *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 591, 575 N.E.2d 828, 832. Accordingly, we must first decide whether a jury instruction on the consumer expectation theory of products liability was warranted under the facts of this case.

 On this question, we are persuaded by the federal court of appeals in *Birchfield v. Internatl. Harvester Co.* (C.A.6, 1984), 726 F.2d 1131, which, applying Ohio law, remanded a products liability case when the trial court failed to give the jury a consumer expectation instruction. The *Birchfield* court stated, at 1136, as follows:

"Since a review of the record reveals no instruction on the issue, we are unable to conclude that the jury verdict in favor of the appellant reflects a proper resolution of it. We note that the test to be applied by the jury in this context is an objective one, to be examined with an eye toward the expectations of an 'ordinary consumer.'" (Citations omitted.)

 Plaintiff contends that the failure to instruct on the consumer expectation test is reversible error. A reasonable juror could have concluded the tire was defectively designed, he argues, because it did not perform as an ordinary consumer would expect the tire to perform. To support the trial court's failure to instruct the jury on a consumer expectation theory, the defendant presents two arguments. First, a consumer has no expectations as to the performance of a tire during a mounting procedure. Second, no objective evidence was presented regarding what ordinary consumers expect of tires in the mounting procedure. This court is not persuaded by either argument. Rather, we are persuaded by the reasoning of the federal appellate court in *Cobos v. Ray–Go Wagner* (C.A.9, 1994), 15 F.3d 1083. In *Cobos,* the court stated that the focus of the consumer expectation test is on whether the hazard is unexpected, not whether the consumer is ordinary.

In the case at bar, plaintiff had every reason to believe that the tire would not explode at a low level of air pressure. Because the instructions on the tire stated that it was to be inflated to a level of thirty-five p.s.i., no ordinary user would expect an explosion to occur at pressure levels around thirty-five p.s.i. The plaintiff presented the testimony of two witnesses and an expert who stated that the tire exploded near or below thirty-five p.s.i. Based on this evidence alone, reasonable minds could reach the conclusion that the tire was more dangerous than a consumer would expect. Since there was sufficient evidence to support an instruction on the consumer expectation test, this assignment of error is well taken.

Plaintiff's second assignment of error states as follows:

"II. The trial court erred by ordering a directed verdict against plaintiff-appellant on the issue of manufacturing defect."

The plaintiff argues that sufficient evidence was presented to overcome a directed verdict on the issue of a manufacturing defect and, therefore, the court erred in granting a directed verdict.

R.C. 2307.74, which concerns manufacturing defects, provides as follows:

"A product is defective in manufacture or construction if, when it left the control of its manufacturer, it deviated in a material way from the design specifications, formula, or *performance standards of the manufacturer*, or from otherwise identical units manufactured to the same design specifications, formula, or performance standards. A product may be defective in manufacture or construction as described in this section even though its manufacturer exercised all possible care in its manufacture or construction." (Emphasis added.)

Plaintiff argues that he produced evidence that the product deviated from the performance standard of the manufacturer. Specifically, plaintiff produced evidence that the tire exploded at less than thirty-five p.s.i., which is less than the performance standard stated for the tire. Defendant argues that plaintiff has produced only circumstantial evidence, which is not sufficient to prove a manufacturing defect.

The parties disagree over what the Ohio Supreme Court has said on this issue. In *State Farm Fire & Cas. Co. v. Chrysler Corp.* (1988), 37 Ohio St.3d 1, 5–6, 523 N.E.2d 489, 493–494 the court described the type of evidence needed to prove a defective product:

"Product defects may be proven by direct or circumstantial evidence. Where direct evidence is unavailable, a defect in a manufactured product existing at the time the product left the manufacturer may be proven by *circumstantial evidence* where a preponderance of that evidence establishes that the loss was caused by a defect and not other possibilities, although not all other possibilities need be eliminated. *Friedman v. General Motors Corp., supra* [ (1975), 43 Ohio St.2d 209, 72 O.O.2d 119, 331 N.E.2d 702]; *State Auto Mut. Ins. Co. v. Chrysler, supra* [36 Ohio St.2d 151, 65 O.O.2d 374, 304 N.E.2d 891]."

Defendant contends that circumstantial evidence can be used to prove a defect only when direct evidence is unavailable.

We disagree. While the absence of direct evidence is a *likely* situation in which one would turn to circumstantial evidence, it is not a *necessary* condition such that it rises to a prerequisite. In *Cincinnati Ins. Co. v. Volkswagen of Am., Inc.* (1985), 29 Ohio App.3d 58, 29 OBR 68, 502 N.E.2d 651, the court specifically held that a defective automotive wire may be proved by circumstantial evidence that the auto fire was caused by the wire because defect-free wires do not usually cause fires. This approach was also followed in *Tittle v. Rent–A–Wreck* (Sept. 24, 1993), Belmont App. No. 92–B–51, unreported, 1993 WL 373842, where the court stated as follows:

"Pursuant to the holding of *State Farm Fire and Cas. Co. v. Chrysler Corp.*, *supra*, it is clear that a product liability case can be proven by demonstrating the existence of a defect by circumstantial evidence."

██ The language employed by the legislature in R.C. 2307.74 supports this position. This statute specifically states that a manufacturing defect can be proved by evidence that the product deviated from the performance standards of the manufacturer. Plaintiff has satisfied this burden. Plaintiff produced evidence that the tire exploded at less than thirty-five p.s.i. Pursuant to the statute, this is below the performance standard stated on the tire. Using the analysis of *Cincinnati Ins. Co.*, defect-free tires do not usually explode. Therefore, plaintiff has produced sufficient evidence to overcome defendant's motion for a directed verdict. This assignment of error is well taken.

On appeal, defendant has raised three cross-assignments of error. The first cross-assignment of error states as follows:

"I. The trial court erred in striking Uniroyal's defense of assumption of the risk."

██ Defendant contends that it should have been allowed to present the defense of assumption of the risk. This defense prevents recovery for a plaintiff when he knowingly encounters an unreasonable risk of harm. *Onderko v. Richmond Mfg. Co.* (1987), 31 Ohio St.3d 296, 31 OBR 576, 511 N.E.2d 388. The Ohio legislature has endorsed this defense in products liability cases. R.C. 2315.20. The question becomes whether this defense is available in a products liability action when the plaintiff is injured in the employment setting. The Supreme Court, while addressing this issue in *Cremeans v. Willmar Henderson Mfg.* (1991), 57 Ohio St.3d 145, 566 N.E.2d 1203, may still have left the issue unresolved. *Cremeans* is a plurality decision. Two justices, Douglas and Sweeney, concurred in the opinion, which stated that assumption of the risk defense can never be used in a products liability action in an employment setting. Two other justices, H. Brown and Resnick, concurred only in the syllabus, which stated that an employee does not voluntarily or unreasonably assume the risk of injury in the course of his employment when that risk must be encountered in the normal performance of his or her required job duties and responsibilities. Finally, Justice Wright concurred in part, stating that the issue of assumption of the risk is a very fact-specific inquiry that should be presented to the jury.

One commentator has stated that *Cremeans* held that assumption of the risk is not available to the defendant when the plaintiff-employee is injured while carrying out normal job-related functions:

"The *Cremeans* majority fully acknowledged the existence of assumption of risk as a defense to products liability in Ohio. Its decision is not a complete

abrogation of the defense. Rather, the court determined that 'an employee does not voluntarily and unreasonably assume the risk of injury which occurs * * * in the normal course of his or her required job duties and responsibilities.' Therefore, the holding should be restricted to those situations where an employee is carrying out normal job-related functions. While not completely abolishing the defense, the court leaves manufacturers little recourse when an employee brings a strict products liability suit." Guilli, The Status of Assumption Of Risk In Product Liability In Ohio After *Cremeans v. Willmar Henderson Mfg.*, 57 Ohio St.3d 145, 566 N.E.2d 1203 (1991) (1978), 18 U.Dayton L.Rev. 243, 254.

Other appellate courts applying *Cremeans* have determined that assumption of the risk is not a defense when the employee is encountering a risk as part of his employment. The court in *Evanoff v. Grove Mfg. Co.* (1994), 99 Ohio App.3d 339, 343, 650 N.E.2d 914, 916–917, stated as follows:

"Even though it has been approximately four years since the *Creamens* [*sic*] decision was rendered, the Supreme Court has not reconsidered this issue. Thus, while this area of the law is still in flux, the *Creamens* [*sic*] decision must be applied in any case in which a manufacturer attempts to assert the defense of assumption of risk. Given that a majority of the *Creamens* [*sic*] Court would only agree that the defense can be asserted in those instances cited by Justice Brown, this court concludes that the standard set forth in his concurring opinion is the one which must be followed until the Supreme Court revisits this issue.

"Generally, in order for the defense of assumption of risk to act as a bar to recovery of damages, the defendant must establish that the plaintiff knew of the condition, that the condition was patently dangerous, and that the plaintiff voluntarily exposed himself to the condition. *Goodin v. Corry* (1982), 5 Ohio App.3d 178 [5 OBR 362], 450 N.E.2d 727. In light of *Cremeans,* we conclude that a plaintiff in a products liability action will only be deemed to have voluntarily exposed himself to a risk when he has elected to use a defective product."

Other post-*Cremeans* courts have found assumption of the risk to be a question of fact for the jury when evidence was presented that the employee deviated from the normal performance of his job duties. In *Syler v. Signode* (1992), 76 Ohio App.3d 250, 601 N.E.2d 225, the court held that assumption of the risk was an issue for the jury because there were questions of fact whether the plaintiff-employee deviated from his normal job duties and encountered an unreasonable risk of harm by not turning off a brick-packing machine before he adjusted it from inside the machine. The court in *Syler* noted that plaintiff admitted that he should turn off the machine before he adjusted it from the inside. In *Whiston v. Bio–Lab, Inc.* (1993), 85 Ohio App.3d 300, 619 N.E.2d 1047, the court held that it was not error to instruct the jury on assumption of the risk when the plaintiff-

employee failed to wear his protective breathing apparatus and clothing and was injured as he picked up a canister of toxic chemicals.

■ From the preceding authority it is apparent that in a products liability case, assumption of the risk is still a viable defense against an employee injured by a defective product in the employment setting. However, assumption of the risk will not be permitted as a defense when the plaintiff is injured while performing normal job activities.

■ In the case at bar, no evidence has been presented to support the proposition that plaintiff voluntarily exposed himself to a known risk by attempting to mount the tire on the floor of the garage. Only if plaintiff knew that the tire would explode during the seating process could it be said that plaintiff assumed an unreasonable risk of harm. Plaintiff testified that the tire was losing air during the mounting process. There was no evidence that plaintiff knew that the tire could explode while still losing air. Moreover, at this garage, it was not an uncommon practice to mount tires on the floor. Plaintiff and his employers had mounted tires in this manner on numerous occasions. Plaintiff was never instructed against using an O-ring. In fact, this procedure was normal as an alternative when the mechanic had difficulty mounting a tire. Moreover, the O-ring was a tool the employer provided. Since the defendant has not presented any evidence that plaintiff knowingly encountered an unreasonable risk of harm, the trial court was correct in not instructing the jury on the defense of assumption of the risk. This cross-assignment of error is overruled.

Defendant's second assignment of error states as follows:

"II. The trial court erred by not granting Uniroyal's motion in limine and evidentiary objections relating to the testimony of Alan Milner."

In this cross-assignment of error, defendant questions Milner's ability to render an expert opinion. Defendant argues that since Milner has never designed a tire, he does not have the requisite qualifications to testify in this litigation.

Evid.R. 702 defines when a witness may testify as an expert. The rule provides as follows:

"A witness may testify as an expert if all of the following apply:

"(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

"(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

"(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a

procedure, test, or experiment, the testimony is reliable only if all of the following apply:

"(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

"(2) The design of the procedure, test, or experiment reliably implements the theory;

"(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."

 Two other courts have reviewed Milner's qualifications and determined that he is qualified to testify as an expert in litigation regarding defective tires. *Pacheco v. Coats Co.* (C.A. 3 1994), 26 F.3d 418; *Montgomery Ward & Co. v. Gregg* (Ind.App.1990), 554 N.E.2d 1145. The court in *Pacheco* described Milner as "a professional engineer and consultant with special expertise in the area of tires and tire explosions." It is well settled that the decisions regarding the admissibility of expert opinions rest within the sound discretion of the trial judge and that decision will not be reversed on appeal unless there is a clear showing that the trial court abused its discretion. *Vinci v. Ceraolo* (1992), 79 Ohio App.3d 640, 607 N.E.2d 1079. An abuse of discretion is defined as more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482–483, 450 N.E.2d 1140, 1141–1142.

Designing tires is not the only way to develop expertise on the subject. Milner's general training in metallurgy and his specific work in failure analysis qualify him as an expert to formulate an opinion as to whether the metal strand portion of the tire was defective. Accordingly, this cross-assignment of error is overruled.

"III. The trial court erred in excluding evidence of plaintiff-appellant's claim against Patch Rubber Company."

 In this cross-assignment of error, defendant argues that it should have been allowed to present evidence that plaintiff filed a complaint against Patch Rubber Company, the company that manufactured the O-ring device used by plaintiff to mount the tire. Defendant contends that pursuant to Evid.R. 801(D)(2),[1] plaintiff's complaint is an admission that the O-ring was defective and that it was the sole proximate cause of plaintiff's injuries. Again, the admission of relevant evidence rests within the sound discretion of the trial court. *State v.*

---

1. Evid.R. 802(D)(2) provides as follows:

*Williams* (1983), 4 Ohio St.3d 53, 4 OBR 144, 446 N.E.2d 444; *Vitanza v. First Natl. Supermarkets* (June 24, 1993), Cuyahoga App. No. 62906, unreported, 1993 WL 226576. In bringing a lawsuit against Patch Rubber, plaintiff sued another manufacturer that may have produced a defective product which caused plaintiff's injuries. Plaintiff did not state in the Patch Rubber complaint that the O-ring was the sole cause of plaintiff's injuries. Additionally, plaintiff attempted to have these two cases consolidated. We have not found, nor has defendant presented, any authority for the proposition that a lawsuit against one manufacturer can be used as an admission against interest in a second lawsuit against another manufacturer. Moreover, in *Vitanza, supra,* a case cited by defendant, this court held that the court did not abuse its discretion when it refused to admit separate pleadings as an admission against interest. Accordingly, this assignment of error is overruled.

The judgment is reversed and the cause is remanded.

*Judgment accordingly.*

MATIA, P.J., and DYKE, J., concur.

---

"Statements which are not hearsay. A statement is not hearsay if:
"* * *
"(2) Admission by party-opponent. The statement is offered against a party and is (a) his own statement, in either his individual or a representative capacity, or (b) a statement of which he has manifested his adoption or belief in its truth, or (c) a statement by a person authorized by him to make a statement concerning the subject, or (d) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, or (e) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy."