DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal comes to us from the grant of summary judgment by the Lucas County Court of Common Pleas in a personal injury case involving alleged defects in the running board of a van. Because we conclude that material facts remain in dispute and appellees were not entitled to judgment as a matter of law, we reverse.
 {¶ 2} In February 2001, appellants, Kathleen L. Winkles and her husband, Terry L. Winkles, sued appellees, Scott Pontiac-Cadillac-GMC Truck, Inc. ("Scott Pontiac"), General Motors Corporation ("GMC"), and Kentron, Inc. ("Kentron") for injuries she allegedly sustained when a running board collapsed on her 1991 GM Safari van. The van was manufactured by GMC and the running boards had been installed by Kentron prior to delivery to Scott Pontiac. Appellants discovered that Kentron was no longer in business. The following information was provided through deposition testimony of Kathleen and her expert witness, Don Jeffers.
 {¶ 3} Kathleen testified that in 1991, she purchased the Safari van as a new vehicle from Scott Pontiac for $17,000. The van had running boards on it from the time of purchase. On February 2, 2000, Kathleen parked her Safari van outside a nail manicure shop in preparation for a job interview she had scheduled for that day. After leaving the shop, she went to her van and opened the driver side door. Kathleen put her right leg into the van with her right foot on the floor, held onto the steering wheel and then stepped on the running board with her left foot. When she put some weight onto the running board, it collapsed down to the pavement. All her weight then shifted to her left leg and she lost her balance. When her left foot hit the pavement, Kathleen said that it "jammed the bone up and just blew out my knee." Despite the sudden collapse, she was able to hold onto the steering wheel, with her left foot and leg on the collapsed running board.
 {¶ 4} A little girl in a car parked next to the van saw Kathleen fall and asked if she needed help. After Kathleen responded affirmatively, the girl sought assistance, and an ambulance arrived approximately 45 minutes later. Kathleen was taken to the hospital emergency room and subsequently underwent surgery to her knee which was fractured by the fall. She left the hospital after five days, continued with in-home exercises for the first four months, and then had clinical physical therapy for an additional three months. Since the end of her therapy, Kathleen still has occasional pain and swelling in her knee, which, according to her doctors, will never get better. She continues to wear an elastic knee brace and takes medication for the pain and inflammation. Her doctors also indicated that she will likely need a knee replacement in the future. Kathleen said that, at the time of her injury, the van had approximately 100,000 miles on it, had been regularly maintained, and had never been in a collision.
 {¶ 5} Don Jeffers, a structural and mechanical engineer, stated in his August 2002 deposition that he had inspected the driver's side repaired running board and the passenger side running board on appellant's van. He tested the boards by pushing on them to check movement and stability, observing that the supports were made of aluminum and attached with screws. His inspection of the passenger side running board revealed stress crack areas which, in his opinion, would eventually also cause that side to collapse. Jeffers said that the running boards were a simple construction, comparable to the frame of a vehicle. In his opinion, unless damaged by other outside forces, running boards should last as long as the vehicle and should not need any special maintenance. He also opined that, compared to the types of running boards that existed from as early as the 1920's, the design of the running boards and their supports on appellants' Safari van were defective and the installation was inadequate.
 {¶ 6} Both Scott Pontiac and GMC filed motions for summary judgment. Scott Pontiac argued that appellants had failed to establish a defect which proximately caused Kathleen's injuries. GMC contended that it had not "manufactured, designed, or installed" or provided specifications for installation of the running boards. The trial court ultimately granted both motions. Appellant now appeals those judgments, setting forth the following five assignments of error:
"1. The trial court erroneously granted summary judgment to the defendant Scott Pontiac.
"2. The trial court erroneously weighed the testimony of the Plaintiff's expert, Don Jeffers, in granting summary judgment to defendant Scott Pontiac.
"3. The trial court ignored the testimony of Plaintiff, Kathleen Winkles, in granting summary judgment to Scott Pontiac.
"4. The trial court erroneously ruled that expert testimony was necessary in this case.
"5. The trial court erroneously granted summary judgment to the defendant General Motors."
 {¶ 7} All of appellants' assignments of error are addressed to the trial court's grant of summary judgment in favor of appellees. The standard of review of a grant or denial of summary judgment is the same for both a trial court and an appellate court. Lorain Natl. Bank v. Saratoga Apts. (1989),61 Ohio App.3d 127, 129. An appellate court reviews summary judgments de novo, that is, independently and without deference to the trial court's determination. Brown v. Scioto Cty. Bd. of Commrs.
(1993), 87 Ohio App.3d 704, 711; Coventry Twp. v. Ecker (1995),101 Ohio App.3d 38, 41-42.
 {¶ 8} Civ.R. 56(C) provides that summary judgment will be granted if "the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of facts, if any, * * * show that there is no genuine issue as to any material fact" and, construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law." In a motion for summary judgment, the moving party must inform the court of the basis of the motion and identify portions in the record which demonstrate the absence of a genuine issue of material fact. If the moving party satisfies that burden, the nonmoving party must then produce evidence as to any issue for which that party bears the burden of production at trial. See Dresher v. Burt (1996), 75 Ohio St.3d 280, limiting Wing v.Anchor Media, Ltd. of Texas (1991), 59 Ohio St.3d 108. With this standard in mind, we now turn to appellants' assignments of error.
 I. {¶ 9} In appellants' second, third, and fourth assignments of error, appellants essentially argue that the trial court erred in granting summary judgment to appellees because the testimony of Kathleen and her expert created issues of material fact as to the defective design and installation of the running board on the van. Kathleen's claims sound in tort under claims for strict product liability for design and installation defects, rather than breach of an express warranty. In an express warranty action, the claims pertain to the enforceability of an express contract between the parties. However, in a products liability claim, the emphasis is on tort liability for damages resulting from a defect in a product placed into the stream of commerce. See Elizabeth Gamble Deaconess Home Assn. v. Turner Constr. Co.
(1984) 14 Ohio App.3d 281, 284 (tort actions created to protect interest in freedom from harm; contract actions created to protect interest in having promises performed).
 {¶ 10} In order to establish the elements of a design defect claim, a plaintiff must show that: (1) there was a defect in the product manufactured and sold by the defendant; (2) the defect existed at the time the product left the defendant's control; and (3) the defect was the direct and proximate cause of the plaintiff's injuries or losses. State Farm Fire Cas. Co. v.Chrysler Corp. (1988), 37 Ohio St.3d 1, 5-6, citing to Lonzrickv. Republic Steel Corp. (1966), 6 Ohio St.2d 227.
 {¶ 11} Regarding the first element, to establish a defect in products designed prior to January 27, 1997 former R.C.2307.75(A)(1) and (2) provided:
"(A) Subject to divisions (D), (E), and (F) of this section, a product is defective in design or formulation if either of the following applies:
"(1) When it left the control of its manufacturer, the foreseeable risks associated with its design or formulation as determined pursuant to division (B) of this section exceeded the benefits associated with that design or formulation as determined pursuant to division (C) of this section;
"(2) It is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. * * *"
 {¶ 12} Subsection (A)(1) is known as the "risk-benefit standard" and subsection (A)(2) is the "consumer expectation standard." Either standard may be used to establish the first element of a design defect claim — the existence of a product defect. State Farm Fire Cas. Co. supra at 6.
 {¶ 13} As a threshold matter, we will first address appellants' fourth assignment in which they assert that the trial court erred in ruling that expert testimony was required to establish a defect in the design and installation of the running board. Contrary to appellees' suggestion, the trial court did not determine that Jeffers was not a qualified expert in the construction of running boards or that his testimony was not admissible. Rather, as we will later discuss in more detail, the trial court's ruling addressed the substance of Jeffers' opinion. Thus, appellees' arguments as to Jeffers' testing procedures or basis for his opinion would go to the weight of the evidence at trial, rather than the admissibility of his testimony. We will now examine whether an expert opinion was required to prove appellants' claims.
 {¶ 14} Although it is often necessary for a plaintiff asserting a design defect claim to present expert testimony in support of that claim, expert testimony is not always required to prove the material elements of a design defect claim. See Atkinsv. GMC (1999), 132 Ohio App.3d 556, 564; Colbach v. UniversalTire Co., Inc. (1996), 108 Ohio App.3d 448, 504; Grover HillGrain Co. v. Baughman-Oster, Inc. (C.A. 6, 1984), 728 F.2d 784,794. Where the claim involves a simple device without any complex features or designs, circumstantial evidence may be sufficient to establish that a defect existed. Atkins, supra.
 {¶ 15} In addition, under the consumer-expectation standard, evidence of unsafe, unexpected product performance is sufficient to infer the existence of a product defect. State Farm Fire Cas. Co., supra, at 7; Atkins, supra. (evidence that door hinges on vehicle "froze" and then suddenly released causing injury sufficient to indicate defect); Porter v. GibsonGreetings, Inc., (Dec. 12, 1997), Montgomery App. No. 16575 (unexpected explosion of balloon indicated defect); Colboch, supra, at 456 (tire exploding unexpectedly at low pressure indicated defect). A product may also be defective in design if the manufacturer fails to incorporate feasible safety features to prevent foreseeable injuries. Perkins v. Wilkinson Sword, Inc.
(1998), 83 Ohio St.3d 507, 511. Furthermore, the question of what an ordinary consumer expects in terms of the risks posed by the product is generally one for the trier of fact. Welch Sand Gravel, Inc. v. O K Trojan, Inc. (1995), 107 Ohio App.3d 218,225.
 {¶ 16} In this case, Kathleen indicated that the running board collapsed suddenly and unexpectedly. As a result of the collapse, she sustained injuries to her knee, providing prima facie evidence that the board was unsafe. In our view, it was certainly foreseeable that, if the running board collapsed when a consumer stepped on it, serious injuries would occur. Therefore, under the consumer expectation standard, Kathleen has established at least an issue of fact regarding whether the running board design and installation method was unreasonably dangerous and, therefore, defective. Even presuming, however, that expert testimony was required, appellants met the requirement. In its judgment entry, the court quoted one sentence of Jeffers' 113 page deposition in making its determination that he had not been "sufficiently certain or specific enough to demonstrate a genuine issue of material fact." This selection disregards the heart of Jeffers' deposition testimony.
 {¶ 17} Jeffers, a structural and mechanical engineer, explained that for many years he had conducted investigations and accident reconstruction for vehicles and been involved in the design of safety features for machinery. In the 1980's, he had done special research into the design and installation of running boards for a friend who wanted to start an installation business. In much detail, Jeffers discussed running board and bracket designs, appropriate construction materials, and methods of attaching running boards. He also discussed cost factors and alternative designs available at the time the van was manufactured, noting that running boards had been around since the 1920's.
 {¶ 18} Jeffers ultimately opined that not only was the design of the running board defective, but also that the installation brackets used were inadequate and, consequently, defective. Having examined the passenger side running board, he noted that due to the stress cracks in the metal and the way it was installed, that side, too, would eventually collapse. Therefore, with or without the expert testimony, appellants established the first element, that a defect existed in the design of the running board. We will now address whether the deposition testimony of Jeffers and Kathleen provided sufficient evidence to withstand a motion for summary judgment as to her products liability claim.
 {¶ 19} The second element of a design defect claim — that the defect existed at the time the product left its manufacturer's control — can be inferred by showing that there has been no "substantial change in the condition in which the product was sold." State Farm Fire Cas. Co., supra. This may be established by showing that the product was not tampered with.McDonald v. Ford Motor Co. (1975), 42 Ohio St.2d 8, 11.
 {¶ 20} In this case, Kathleen testified that the van had been sold to her in 1991 as a brand-new vehicle from GMC via the dealer, Scott Pontiac. When asked whether she had the vehicle outfitted with any special packages, she said that she bought it "as is * * * just on the lot." She also said that the van, including the running board, had never been in a collision. Appellees offered nothing to rebut this testimony. Thus, the evidence on the record is that the running boards were in a substantially unchanged condition from the time they left the dealership to the time of the collapse. Therefore, appellants established the second element.
 {¶ 21} Finally, to establish the third element of a design defect claim, causation, a plaintiff must prove, by a preponderance of the evidence, that some aspect of the challenged design rendered the product's performance less safe than the ordinary consumer would expect and proximately caused the plaintiff's injuries. State Farm Fire Cas. Co., supra. See, also, Atkins, supra. Proximate cause "has been defined as: `That which immediately precedes and produces the effect, as distinguished from a remote, mediate, or predisposing cause; that from which the fact might be expected to follow without the concurrence of any unusual circumstance; that without which the accident would not have happened, and from which the injury or a like injury might have been anticipated.'" Hunt v. MarksmanProducts (1995), 101 Ohio App.3d 760, 763, citing Jeffers v.Olexo (1989), 43 Ohio St.3d 140, 143.
 {¶ 22} As we already noted, Jeffers stated that the defects in the running board design and installation were the cause of the collapse, and that the other side would collapse at some point as well. He noted that the design and materials used were not sufficient to support the weight of average or larger consumers. According to Jeffers, a running board should not need any special maintenance and, like the frame of a vehicle, should last as long as the life of the vehicle to which it is attached. Kathleen stated that the running board's collapse was unexpected, that the pavement was dry, and that she did not slip on anything getting into the van. She also described the injury to her knee that occurred as an immediate and direct result of the collapse. Nothing in the record indicates that anything but the collapse of the running board caused her knee injury. Thus, appellants' evidence met the third element to withstand summary judgment.
 {¶ 23} We note that appellees argue that alternate designs were not available and that there may be other reasons for the collapse. These contentions represent issues to be raised at trial, but are not appropriate considerations on summary judgment. As noted above, under the "consumer expectation" standard, appellants were only required to provide sufficient evidence that the running board failed to perform in a safe and expected manner and that the defect was the proximate cause of Kathleen's injury. Therefore, the trial court erroneously weighed Jeffers' deposition testimony and failed to properly consider Kathleen's deposition testimony.
 {¶ 24} Accordingly, appellants' second, third, and fourth assignments of error are well-taken.
 II. {¶ 25} We turn now to appellants' first and fifth assignments of error to determine whether appellees, Scott Pontiac and GMC were properly granted summary judgment.
 {¶ 26} R.C. 2307.71 provides, in pertinent part:
"(I) `Manufacturer' means a person engaged in a business to design, formulate, produce, create, make, construct, assemble, or rebuild a product or a component of a product.
"* * *
"(O)(1) "Supplier" means, subject to division (O)(2) of this section, either of the following:
"(a) A person that, in the course of a business conducted for the purpose sells, distributes, leases, prepares, blends, packages, labels, or other wise participates in the placing of a product in the stream of commerce;
"(b) A person that, in the course of a business conducted for the purpose, installs, repairs, or maintains any aspect of a product that allegedly causes harm.
"(2) `Supplier' does not include any of the following:
"(a) A manufacturer; * * *" (Emphasis added.)
 {¶ 27} Under this definition an entity is a manufacturer if it assembles components into a design which creates a product.Leibreich v. A.J. Refrigeration, Inc. (1993),67 Ohio St.3d 266, 271. As a manufacturer, it can be subject to strict liability in tort if the product so created is defective and unreasonably dangerous. Id. "A product may be comprised of several parts and, thus, the product is the sum of its parts. If one of the components in the finished product is defective, then the finished product itself may become defective as a result. The policy behind products liability is to place liability on those who create the danger by placing the defective product into the stream of commerce." Anderson v. Olmsted Utility Equipment,Inc. (1991), 60 Ohio St.3d 124, 131. A manufacturer of a finished product who is required to pay for injuries sustained by a third party due to the defective condition of a component part integrated into the product may bring a cause of action for indemnification against the manufacturer or supplier of that component part. Id. In determining liability between the manufacturer and the component part maker, however, the issue of how much input and control a manufacturer has over component parts is generally an issue for the trier of fact. See Leibreichv. A.J. Refrigeration, Inc., supra, at 272.
 {¶ 28} In this case, pursuant to R.C. 2307.71(O), Scott Pontiac, as the distributor of the van, may be liable as a "supplier" for any alleged defects in the running board. GMC argues, however, that because it offered an affidavit of one of its engineers to state that the running boards "were not manufactured, designed or installed by General Motors," it is not liable for any alleged defect since the running boards were installed on the van after it left GMC's factory and "control." Although this may remove it from some parts of the statutory definition, it does not negate its role as a "producer" or "creator" of the van.
 {¶ 29} GMC's responses to interrogatories show that the van was delivered directly to Kentron on April 22, 1991, before being sent on to Scott Pontiac on May 6, 1991. A shipping invoice also indicates that GMC was aware that the van was being sent to Kentron for the addition of certain items prior to its delivery to the dealership. Furthermore, nothing in the record shows that the running boards were specially installed at Kathleen's request or that the vehicle was offered as a "custom" van. According to the record, Kathleen purchased the van as a new GMC vehicle from an authorized GMC dealer with nothing to indicate that the van was not completely manufactured or produced under the auspices of GMC. GMC, as a producer or creator of a van which was distributed and sold as a new GMC vehicle, may not be automatically released from liability for a component part which has been added to the vehicle after leaving the factory but prior to arrival at the dealership. While GMC may have a claim for indemnification against Kentron or the dealership, it may still be held liable for any alleged defects in a van which is sold as a GMC vehicle. See Andersen, supra. Thus, there is a question of fact as to GMC's authorization or acceptance of Kentron as their agent to install running boards as an integral part of a vehicle which entered the stream of commerce as a GMC van, and GMC may still be liable for the alleged defects as a producer or creator under R.C. 2701.71.
 {¶ 30} Therefore, since material issues of fact remain in dispute and appellees were not entitled to judgment as a matter of law, the trial court erred in granting summary judgment in favor of GMC and Scott Pontiac. Accordingly, appellants' first and fifth assignments of error are well-taken.
 {¶ 31} The judgment of the Lucas County Court of Common Pleas is reversed and remanded for proceedings consistent with this decision. Court costs of this appeal are assessed equally between appellees.
Judgment reversed.
Knepper, J., Lanzinger, J., Singer, J., concur.